## ALBERS et ux. v. SAENGER.

### No. 9810.

Court of Civil Appeals of Texas. Austin.
July 6, 1949.

Rehearing Denied July 23, 1949.

C. C. Jopling, of La Grange, Thos. W. Thompson, of Giddings, for appellants.

E. T. Simmang and John S. Simmang, of Giddings, for appellee.

ARCHER, Chief Justice.

This appeal in the first instance raises the question, as a matter of law, of the effectiveness of the conveyance on December 5, 1932, by E. G. Albers and wife to Willie Saenger of a tract of land in Lee County, Texas, on which the grantors resided as their homestead; and, in the second instance, of the sufficiency of an oral agreement to extend the notes created in the deed, which, except for the oral agreement, would have been barred by the stat-

ute of limitation. The case was tried with the aid of a jury and, upon issues submitted by the trial court, the jury made answers favorable to the cross-plaintiff therein, and, on which verdict, the court rendered judgment for the cross-plaintiff for $4,393.21, and for foreclosure of the vendor's lien; and from this judgment and orders overruling motions for judgment and for new trial the cross-defendants have perfected an appeal to this court. The Albers instituted a trespass to try title suit to remove the cloud cast on their title to the land described in the deed, and Saenger, in answer thereto and by way of cross-action, sought a foreclosure of his lien, with the results as herein set out.

The appellants assign as error fifteen points, and present them in six groups.

By assignments Nos. 1, 2, 3 and 4 complaint is made of the action of the court in rendering judgment on the notes, and say that the evidence was insufficient to show a valid renewal of the notes and lien, and not sufficient to support an affirmative answer to special issue No. 4, and that as a matter of law the pleadings and evidence were not such as would constitute a valid extension agreement of the notes sued on, and that there was no valid consideration to extend the time of payment of the notes.

Special issue No. 1 inquired of the jury if an agreement was had between the Albers and Saenger to convey the land unconditionally, and the jury answered, "Yes"; by issue No. 2, conditioned on an affirmative answer to No. 1, inquiry was made if there was a subsequent agreement to convey the land and retain a lien to secure the purchase price, and the jury found that there was such an agreement; and by No. 3 the jury was asked if the deeds and notes were executed to carry out the agreements, and to this the jury answered, "Yes"; by special issue No. 4 the jury was asked if the notes and lien were extended on December 4, 1946, for one year by agreement of the parties, and the answer was "Yes".

On and prior to December 5, 1932, Albers owed Saenger about $1,300, and on December 5, 1932, the date of the execution of the deeds, Saenger purchased the land from the Albers outright for a consideration of $2,100, which was made up of the prior indebtedness and seven or eight hundred dollars in cash.

In the deed to the Albers from Saenger the consideration was recited as $2,900 cash and the execution of nine notes aggregating $2,100, and payable annually on December 5, 1934 to and including December 5, 1942, and bearing 5% interest, providing for 10% attorney's fees, with usual maturity clause in case of default in payment.

These deeds were executed the same day and recorded on the same day.

The appellants allege that the deeds were not bona fide but only simulated and for the purpose of creating a mortgage or lien on their homestead for a preexisting debt.

By answer to issue No. 5 the jury found that it was not a simulated sale.

There is no question but that the land described in the deeds was the homestead of the Albers and that they were actually residing on it. The testimony of Mr. Saenger on cross-examination was as follows:

"Q. * * * Now, when you bought the land that you claim from E. G. Albers and wife, what did you pay for the land? A. Twenty-one Hundred.

"Q. In cash or in notes? A. In notes and cash.

"Q. How much cash? A. There was Seven or Eight Hundred.

"Q. You let him have the Seven or Eight Hundred Dollars more money at that time? A. Yes, sir.

"Q. And then, when you sold the land back to Mr. Albers and his wife, did you get some cash, besides the notes? A. No; I taken the notes.

"Q. The recitation, then, that you got $2,900 cash is not true, then, is it? A. No; not that I know of.

"Q. So, I want to get this clear in my mind—that's the only transaction that you had with Mr. Albers, with reference to Mr. Albers and his wife selling you this land, was with Mr. Albers alone and not his wife and was verbal; is that correct? You just talked to Mr. Albers about it? A. Yes; she come out there quite frequent at that time.

"Q. And then, according to your statement, you and Mr. Albers agreed that he and his wife would deed you this land and then, even before any deed was made to you, you made another agreement that you deed the land back to him; is that right? A. Yes.

"Q. That's the way you tell it? A. Not at the same time.

"Q. Not at the same time? A. Not at the same day; when he agreed to sell it to me, it was later.

"Q. But, before you signed these papers on December 5th? A. That's right.

"Q. You had agreed that you would deed it back? A. That's right.

\*   \*   \*   \*   \*   \*

"Q. What kind of stake did you have in it, Mr. Saenger, at the time? What did you want to fix these papers for, anyhow? A. Well, he wanted to loan some money and I didn't want to loan him any; that was it.

"Q. And, Mr. Albers and the lawyer told you that you could fix the papers this way and make a good loan? A. No; I wasn't intending to make no loan.

"Q. Well, you did let him have another $800? A. Well, I bought the place, and that was in payment.

"Q. Mr. Saenger, how do you figure you had bought the place, when you didn't have a deed to it? A. Well, I got a deed before I let him have the money or at the same time."

■ Albers testified that he would give Saenger security or give some notes that could be cashed, and that he could give notes on the place but that it was his homestead; but if he gave security on the farm he would have to get $500 more money; and that the deeds were executed the same day and recorded by Albers on the same day. In our opinion the deeds were executed for the purpose of fixing a lien on the land, and were simulated and not bona fide sales, and that this is true as a matter of law.

Section 50 of Art. XVI of the State Constitution, Vernon's Ann.St., provides, in part, as follows: "The homestead of a family shall be, and is hereby protected from forced sale, for the payment of all debts except for the purchase money thereof, or a part of such purchase money, the taxes due thereon, or for work and material used in constructing improvements thereon \* \* \*. No mortgage, trust deed, or other lien on the homestead shall ever be valid, except for the purchase money therefor, or improvements made thereon, as hereinbefore provided, whether such mortgage, or trust deed, or other lien, shall have been created by the husband alone, or together with his wife; and all pretended sales of the homestead involving any condition of defeasance shall be void."

In Andrews v. Security Nat. Bank of Wichita Falls, 121 Tex. 409, 50 S.W.2d 253, 256, 83 A.L.R. 44, it is held:

"Homestead laws are not only based upon a tender regard for the welfare of the citizen, but have for their object the stability and welfare of the state. 29 Corpus Juris, pp. 782, 783. \* \* \*

"The universal rule of construction is that homestead provisions of the organic law and statutes are to be liberally construed, for the purpose of effectuating the wise and salutary provisions thereof. 13 Ruling Case Law, p. 547, § 8; 29 Corpus Juris, p. 787, § 15; Woods v. Alvarado State Bank., 118 Tex. 586, 19 S.W.2d 35. \* \* \*

"The fact that a lien may be evidenced by notes or by deed purporting to retain a vendor's lien does not make it a vendor's lien or prevent its validity from being questioned. The prohibited lien is void regardless of its form. Nunn on Homestead and Other Exemptions, pp. 42, 43, § 4, pp. 46, 47, § 6."

The net result and the effect of the deeds, and the only one agreed to and anticipated by the parties, was that title and possession of the land would remain the same but with Saenger's unsecured indebtedness and the cash advance becoming liens on the land, and we believe this to be in violation of the constitution, as herein set out, and void. Art. 16, Sec. 50 of the Constitution; Anglin v. Cisco Mortg. Loan Co., 135 Tex. 188, 141 S.W.2d 935; Andrews v. Security Nat. Bank of Wichita Falls, 121 Tex. 409, 50 S.W.2d 253, 83 A.L.R. 44.

By their assignments of error Nos. 1, 2, 3 and 4 the appellants allege that there

was no valid renewal and extension of the notes, as a matter of fact and as a matter of law, under the pleadings and the evidence offered in the trial of the case. As we have heretofore stated, these notes were dated December 5, 1932, and payable annually thereafter, and except for the adequacy of the oral agreement to renew them, would have been barred by the statute of limitations.

Saenger in his cross-action alleged that the Albers agreed and promised, on December 4, 1946, to pay off the notes and pay him the same rate of interest for another year. From Saenger's testimony we quote:

"A. Well, I asked him to pay me and he said he wasn't able to, and, then just before I left, he asked me to wait another year— he didn't know whether I still was the owner of the notes or some excuse he had, and before I left, there out on the porch, I told him I would agree with him, I would wait.

"Q. You agreed you would wait another year? A. Yes, sir.

"Q. Is that all there was to it? A. That's practically all there is to it; I taken his word.

"Q. Did he—was anything said about it being paid within the year? Was it a straight year or could he pay it any time during the year; I will put it that way? A. Well, he asked me for another year extension, and I O. K.'d it.

"Q. And, you O. K.'d it? Who wrote that on the back of these notes there extended? A. This up here? (Referring to note.)

"Q. This? (Indicating.) A. I wrote that that night after I got home.

"Q. What is that you wrote on the back of the notes? A. 'Note extended for one year—December 4th, 1946.'

"Q. You wrote that yourself? When did you write that there? A. That night after I got home from Albers when I seen him the last time."

The cross-defendants denied making any agreement or promise to renew and extend the notes.

Special issue No. 4 inquired of the jury if the notes and lien were extended for one year by agreement between the parties on December 4, 1946, and the jury answered, "Yes". The jury having seen the witnesses and heard them testify, and being the exclusive judges of the credibility of the witnesses and the weight to be given their testimony, found by its answer that such an agreement had been made, and we believe that the jury's finding is reasonably supported by the evidence.

The Albers by the oral agreement secured more time and avoided an immediate suit to foreclose on the notes, and Saenger did forego his privilege to have had suit instituted on the notes, and further secured the benefit of an additional year's interest on the notes; and we believe discharged his burden of proving all facts necessary to substantiate his allegations of an oral agreement to extend the notes for another year.

From McNeill v. Simpson, Tex.Com. App., 39 S.W.2d 835, we quote:

"Where the parties to a promissory note, which is past due but is unbarred by limitation, and which by its terms bears interest until paid, mutually agree to an extension of the time of payment of the note to a future date, a new contract, based upon a new consideration deemed valuable in law, arises between the parties. By such an agreement, each of the parties becomes obligated to the other in respects not comprehended by the contract arising from the note. The payee impliedly promises to surrender his present right to demand immediate payment of the indebtedness represented by the note, and to forego suit during the extension period; the payor impliedly promises to pay said indebtedness on the new maturity date, together with interest up to that date, in any event, at the rate provided in the note. Each of these new promises constitutes the consideration for the other, and a binding contract, embodying the terms of the note, as modified by the new agreement, results. Benson v. Phipps, 87 Tex. 578, 29 S.W. 1061, 47 Am.St.Rep. 128. In such a case, we understand the rule to be that, despite the fact that said agreement is oral, the existing right of action, which accrued to the creditor under the note, is relinquished, and that another right of action for the debt does not accrue

to him until the new promise of the debtor to pay is breached. Limitation does not commence to run against an action to enforce the debtor's new promise to pay, until the time for performance of the new promise arrives. * * *

"The foregoing legal principles are applicable to the present case. The words of the agreement of January 1927, were that the 'note' was to be 'carried another year.' This language clearly imports a purpose to extend the time of payment of the indebtedness evidenced by the note to January 1, 1928. From this extension agreement, constituting as it does a new contract binding the respective parties to new engagements, the cause of action declared on arose. This cause of action has never become barred by limitation; therefore article 5539 of the statute does not apply."

We believe that the amendments, permitted by the court to include attorney's fees and for compound interest, were authorized, and that the cross-defendants were in nowise surprised since the notes provided for interest and attorney's fees, and we overrule these assignments Nos. 11, 12, 13, 14 and 15. Rule 66, Vernon's Texas Rules of Civil Procedure, with cases cited.

The judgment of the trial court will be reformed so as to deny foreclosure of any lien on the premises, and as so reformed is affirmed.

Reformed and affirmed.